No. 93-421

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

IN RE THE MARRIAGE OF

ANTIONETTE MARIE DREESBACH,

    Petitioner and Appellant,

  and

ALAN WILLIAM DREESBACH, II,

    Respondent and Respondent.

FILED

APR 2 1 1994

~~~ Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Second Judicial District,
               In and for the County of Silver Bow,
               The Honorable James E. Purcell, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Christopher Daly, Attorney at Law, Missoula, Montana

    For Respondent:

        Christine Somers; Haxby & Somers, Butte, Montana

        Kevin Callaghan, Attorney at Law, Missoula, Montana
        (guardian ad litem)

Submitted on Briefs:  February 24, 1994

Decided:  April 21, 1994

Filed:

_____
        Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Appellant Antionette Marie Dreesbach (Antionette) appeals the findings of fact, conclusions of law and decree of dissolution from the Second Judicial District Court, Silver Bow County. Antionette challenges several of the court's determinations, including issues of custody, contempt, visitation, division of marital assets, and modification of custody. We affirm in part and reverse in part.

Antionette raises eight issues on appeal. We consolidate and restate the issues which are properly before this Court:

1. Did the District Court err by awarding joint custody?

2. Did the District Court err by awarding visitation?

3. Did the District Court err by finding Antionette in contempt and in its related punishment?

4. Did the District Court err in dividing the marital assets?

5. Did the District Court err by modifying custody pending appeal?

This case arises from a protracted, bitter marriage dissolution. Alan William Dreesbach, Jr. (Alan) and Antionette were married on July 18, 1987. Antionette entered the marriage with a daughter, Reva Wansrath (Reva), from a previous relationship. Alan was not Reva's natural father, nor did he adopt her. Alan and Antionette had one child, Morgan Antone Dreesbach (Morgan), on February 26, 1987.

Antionette alleges that over the course of their marriage, Alan physically abused Morgan, and physically and sexually abused Reva. Alan adamantly denied these allegations. Because of this

2

alleged abuse, the District Court appointed a guardian ad litem to represent Morgan's best interest and to assist the court with its custody decision. Despite a court order, Antionette refused to allow Alan to visit Morgan.

Antionette's experts testified that they had uncovered circumstantial evidence of abuse through sessions with Antionette and the two minor children; however, neither of these experts evaluated Alan. The District Court appointed Dr. Sarah Baxter to conduct a custodial evaluation. Dr. Baxter could not confirm sexual or physical abuse. Rather, Dr. Baxter concluded that Antionette suffered from acute paranoia, was terrified of losing control of Morgan, and was extremely hostile toward Alan.

After several hearings, a hearing to dissolve the marriage between Alan and Antionette was held on May 18, 1993. In its order of July 2, 1993, the District Court granted joint custody of Morgan, and designated Antionette as Morgan's primary physical custodian. The District Court determined that Antionette's allegations of physical and sexual abuse were false; that there was insufficient evidence to substantiate sexual or physical abuse of the children; and that Antionette had intentionally and persistently interfered with Alan's right to visit Morgan. The court found Antionette in contempt for frustrating Alan's visitation attempts. The District Court also divided the couple's marital assets and elected not to remove Alan's name from Reva's birth certificate.

On August 26, 1993, the District Court issued a temporary

3

order modifying custody, pending appeal. That order gave Alan sole custody of Morgan. Antionette filed a writ of supervisory control with this Court, which was denied on September 16, 1993. Antionette appeals.

I

Did the District Court err by awarding joint custody?

Our standard of review in a child custody case is whether the district court's findings are clearly erroneous. In re Marriage of Maxwell (1991), 248 Mont. 189, 193, 810 P.2d 311, 313. The court's decision will be upheld unless a clear abuse of discretion is shown. In re Marriage of Susen (1990), 242 Mont. 10, 13-14, 788 P.2d 332, 334.

We have held that findings of fact must be based on substantial credible evidence. In re Marriage of Hurley (1986), 222 Mont. 287, 296, 721 P.2d 1279, 1285. Furthermore, a presumption exists in favor of joint custody. Section 40-4-222, MCA.

The district court is required to consider the child's "best interest" when determining custody. Section 40-4-212, MCA. The statute provides a list of factors which the court must consider in making its determination; however, the court is not required to make specific findings on each individual factor. In re Marriage of Merriman (1991), 247 Mont. 491, 493, 807 P.2d 1351, 1353.

In the present case, the parties presented conflicting evidence as to Morgan's best interest. Antionette wanted sole custody of Morgan, while Alan wanted joint custody. The District

4

Court granted joint custody of Morgan, with Antionette as the primary physical custodian. Despite the District Court's specific findings to the contrary, Antionette insists that Alan sexually abused the children.

According to Antionette, the court adopted the majority of its findings of fact nearly verbatim from the findings proposed by the guardian ad litem. In so doing, Antionette argues, the District Court failed to exercise independent judgment. See In re Marriage of Tahija (1992), 253 Mont. 505, 508, 833 P.2d 1095, 1096 (citation omitted). For example, she argues that Finding 20(b) indicates that Antionette willfully and consistently frustrated visitation, while the record indicates that both parties frustrated visitation. Moreover, the court found that Marsha Kirchner, a professional counselor from the Department of Family Services, was credible at an April 6, 1992, hearing; however, the court found that Ms. Kirchner was not credible during the May 18, 1993, trial.

The record demonstrates that the court did, in fact, exercise independent judgment. First, the District Court appointed a guardian ad litem to represent Morgan's interests. It also ordered a custodial evaluation, which was conducted by Dr. Sarah Baxter, a psychologist, and Dr. William Stratford, a psychiatrist.

The court further heard testimony from Dr. Baxter that Morgan did not mention any sexual abuse by Alan. Moreover, Dr. Baxter could not confirm or discredit the allegations of sexual and physical abuse in her evaluations of Morgan and the parents. Rather, the custodial evaluation indicated that Antionette's

5

allegations may have resulted from Antionette's "extreme paranoid disorder," a condition which she cannot control.

The custodial evaluation also indicated that Alan and Morgan interacted well together; that Alan displayed no hostility to either Morgan or Antionette; and that during the supervised visitation, Alan behaved appropriately. Notably, even Antionette's expert witness, Ms. Kirchner, testified that she had not ruled out the possibility that Antionette might have caused Morgan's withdrawal symptoms.

The District Court considered--and we have reviewed--the depositions of Lynn Stewart, a professional counselor, and Dr. Timothy Carte, both of whom were retained by Antionette. The District Court found that Ms. Stewart's deposition and testimony were not credible. However, the court found the evaluations of Drs. Baxter and Stratford and the testimony of Dr. Baxter to be persuasive. The District Court was in the best position to observe the witnesses and their demeanor. See In re Marriage of Ernst (1990), 243 Mont. 114, 122, 793 P.2d 777, 782.

The District Court thoroughly analyzed the record before it. The court reviewed, considered and relied on the opinions of the neutral experts, which were requested by the court to conduct a custodial evaluation. See In re Marriage of Ereth (1988), 232 Mont. 492, 494, 757 P.2d 1312, 1313-14. Contrary to Antionette's assertions, the record is replete with substantial credible evidence which supports the District Court's findings. Furthermore, the court carefully considered the factors set out in

6

§ 40-4-212, MCA, when it made its determination. The District Court's findings were not clearly erroneous.

II

Did the District Court err by awarding visitation which differed from the proposal of the custody evaluator?

Our standard of review for visitation is whether substantial credible evidence supports the district court's findings. In re Marriage of Nash (1992), 254 Mont. 231, 234, 836 P.2d 598, 600. We will overturn a court's visitation decision only when the court's findings and conclusions clearly demonstrate an abuse of discretion. In re Marriage of Anderson (1993), 260 Mont. 246, 254-55, 859 P.2d 451, 454.

During trial, Dr. Baxter recommended that: 1) Antionette continue receiving psychotherapy; 2) Alan and Morgan be involved in joint family therapy; 3) therapy should be overseen by someone other than Ms. Stewart; 4) overnight or lengthy, unsupervised visits between Alan and Morgan were not favored at that time; 5) Alan and Antionette have no contact; and 6) the guardian ad litem or a case manager should be appointed to ensure that therapy appointments were kept.

Antionette argues that the District Court ignored these recommendations when it made its findings. Antionette contends that the court essentially "rubber stamped" the guardian ad litem's proposed findings and failed to exercise independent judgment by not conforming its findings to Dr. Baxter's testimony. Antionette is mistaken.

7

Although the District Court adopted the visitation schedule proposed by the guardian ad litem, it specifically found that Dr. Baxter or her chosen representative should supervise Alan and Morgan's visitation "for the shortest duration [which Dr. Baxter or a professional chosen by Dr. Baxter] deem[s] appropriate and reasonable" before unsupervised visitation begins. The District Court allowed for joint therapy at Dr. Baxter's discretion "to repair the damage to [Alan and Morgan's] relationship which has been caused by [Antionette's] conduct."

While it is true that a separate case manager was not appointed to ensure that therapy appointments were kept, this Court concludes that there is no need for a separate case manager. Rather, as the District Court determined, Dr. Baxter or her chosen representative shall be entrusted to supervise visitation and oversee the process until unsupervised visitation is deemed appropriate. We hold that the District Court's visitation determination was based on substantial credible evidence, was not clearly erroneous, and will not be overturned.

Antionette also challenges the award of visitation to Morgan's great grandmother and great-great grandmother on Alan's side of the family. She argues that Montana's grandparent visitation statutes do not address great-grandparent visitation. See §§ 40-9-101 et seq., MCA. However, the record is clear that no independent grandparent or great-grandparent visitation rights have been sought or granted. District Court Finding No. 20(s) provides that "[t]he Respondent's grandparental visitations shall be had during

8

visitations with the Respondent." Absent allegations of attempted independent great-grandparent visitation or a District Court finding on independent great-grandparent visitation rights, we conclude that the issue is moot. However, we note that nothing prohibits the great-grandmother and great-great grandmother from visiting Morgan when Alan is exercising his visitation rights.

III

Did the District Court err by finding Antionette in contempt and in its related punishment?

Although contempt orders by the district court are final and not normally reviewable by this Court, per § 3-1-523, MCA, we make an exception in family law cases. In re Marriage of Boharski (1993), 257 Mont. 71, 77, 847 P.2d 709, 713 (citations omitted). Our review is limited to whether the district court acted within its jurisdiction and whether the evidence supports the contempt. In re Marriage of Sullivan (1993), 258 Mont. 531, 539-40, 853 P.2d 1194, 1200.

The District Court found, and the record shows, that Antionette repeatedly frustrated Alan's visitation attempts. For example, although ordered by the court to allow Alan supervised visitation with Morgan at a day care center, Antionette on one occasion never showed up with the child. On two other occasions, Antionette met Alan at the day care center, but insisted that he sign a sheet of "visitation rules"--prepared by Antionette--before he could see Morgan. On both occasions, Alan refused and was denied the right to visit Morgan. In all instances, Alan had

9

driven from Butte to Missoula to visit, and called to confirm the visits before making the trips.

The District Court held a contempt hearing on July 30, 1992; however, it reached no decision and the contempt proceedings were incorporated into the final trial on the merits. Antionette claims that her rules arose from revelations by Morgan to Lynn Stewart during therapy--apparently that Alan had physically abused Morgan. Antionette contends that she had a right to require Alan to sign her rules because she believed she was acting in Morgan's best interest. According to Antionette, this Court has held that if a party disregards a court order based on concerns for a child's health and not on a desire to restrict access, contempt is not proper. In re Marriage of Jacobson (1987), 228 Mont. 458, 464, 743 P.2d 1025, 1028.

In the present case, the court ordered supervised visitation. It was Antionette--not the court--who decided that visitation would endanger Morgan's health. Antionette had no authority to limit, or place any restrictions on, Alan's visitation. Undoubtedly, the District Court was correct in finding Antionette in contempt for consistently frustrating Alan's visitation of Morgan and for levying "false accusations of sexual and physical abuse against [Alan] without reasonable justification in a calcualted [sic] attempt to deprive [Alan] contact with his child and to gain advantage in this proceeding."

We turn, then, to whether the District Court's punishment for contempt was appropriate. Section 3-1-519, MCA, provides in

10

pertinent part, that:

> [i]f it be adjudged that he is guilty of the contempt, a fine may be imposed on him not exceeding $500 or he may be imprisoned not exceeding 5 days or both.

Antionette challenges the contempt punishment imposed by the District Court, which required Antionette to seek on-going professional counseling and bear the costs of that counseling. It also resolved the issue of Alan's alleged child support arrearages and day care obligations in his favor. Antionette contends that requiring her to pay counseling costs amounts to an "open-ended blank check." She further argues that the court's equitable powers cannot contravene Montana statutes, which limit the financial punishment for contempt to $500. Section 3-1-519, MCA.

Alan contends that despite the finding that she was in contempt, Antionette went unpunished for contempt. First, Alan correctly argues that the court, in Finding No. 28, had already found him to be current in his child support and day care obligations. Second, Alan argues, and we agree, that the District Court has equitable powers to punish a party for contempt beyond the confines of § 3-1-519, MCA. See Boharski, 847 P.2d at 713 (thirty-day jail term for contempt upheld); In re Marriage of Redfern (1984), 214 Mont. 169, 173, 692 P.2d 468, 470 (reasonable attorney's fees permissible in a contempt action).

Despite the District Court's decree, we note that Antionette's attorney continues to refer to Alan as a "substantiated child abuser." We further note that the District Court did not, as it could have, find Antionette in contempt for each of her numerous

11

acts of contempt. Moreover, for the most part, the "punishments" levied against Antionette were not, in fact, punishments. Rather, Finding No. 21 already required--upon recommendation of the guardian ad litem and custodial evaluator, Dr. Baxter--that Antionette seek and continue psychological counseling and therapy.

After a careful review of the record, we are convinced that the District Court was warranted in ordering Antionette to continue therapy for two years. Although the two-year therapy requirement will likely cost Antionette more than the $500 provided for in § 3-1-519, MCA, we hold that 1) the evidence supports the finding of contempt; 2) the court acted within its jurisdiction and equitable powers when imposing the punishment; and 3) the contempt penalties imposed by the court had, in large part, been previously imposed through Finding Nos. 21 and 28.

IV

Did the District Court err in dividing the marital assets?

The District Court appointed a special master to handle the financial aspects of this case. Antionette contends that when, as here, a special master is used, the procedures outlined in Rule 53, M.R.Civ.P., must be followed. Antionette also argues that the District Court failed to consider the total value of the marital estate when dividing the marital assets, as required by this Court in In re Marriage of Peterson (1981), 195 Mont. 157, 159, 636 P.2d 821, 822-24.

When a special master is appointed, the district court must follow the procedures outlined in Rule 53, M.R.Civ.P. The district

12

court must give the special master an order of reference to follow. See Rule 53(c), (d), and (e), M.R.Civ.P.

> The order of reference to the master may specify or limit the master's powers and may direct the master to report only upon particular issues or to do or perform particular acts or to receive and report evidence only and may fix the time and place for beginning and closing the hearings and for the filing of the master's report.

Rule 53(c), M.R.Civ.P. Rule 53(e)(1), M.R.Civ.P., requires the special master to provide the district court with a report based on the order of reference and file the report with the clerk of court. The parties then have ten days to object to the special master's report. Rule 53(e)(2), M.R.Civ.P.

Here, the District Court failed to submit an order of reference to the special master and the special master's proposed decision went directly to the District Court. The court, in turn, stated in its findings that there was an equitable division of the debts and assets. Although the District Court erred by not following the procedures outlined in Rule 53, M.R.Civ.P., we conclude that the error was harmless. In re Marriage of Lopez (1992), 255 Mont. 238, 245, 841 P.2d 1122, 1126. "[T]o warrant reversal, [an error] must materially affect the substantial rights of the party." Lopez, 841 P.2d at 1126.

Here, Antionette's rights were not materially affected. Even though the District Court adopted the special master's findings, the findings were not clearly erroneous. See In re Marriage of Danelson (1992), 253 Mont. 310, 317, 833 P.2d 215, 219. In fact, the findings reflected a thorough consideration of the factors listed in § 40-4-201, MCA.

13

Further, Alan contends that the District Court was not required to make a specific determination as to net worth of the marital assets because it did not order a distribution of property. Rather, Alan argues that the District Court considered the parties' net worth in terms of income and income producing ability.

We must examine the record to determine whether the district court's findings as a whole are sufficient to determine the net worth and to decide if the distribution was equitable. In re Marriage of Stevenson (1989), 237 Mont. 157, 160, 772 P.2d 846, 848 (citation omitted). In this case, the District Court fully considered the factors in § 40-4-201(1), MCA. It considered the incomes and financial affidavits of both parties, which evidenced significant debts. For example, Antionette owed more than $3,400 in litigation/attorney expenses, almost $ 5,900 in student loans, $3,500 to Lynn Stewart, and $1,700 in other loans. Alan, on the other hand, owed $4,200 in litigation-related expenses, more than $10,000 in student loans, $2,800 to Dr. Baxter, and $400 in credit card bills.

Antionette challenges the "heavy" burden imposed on her by the District Court. The court ordered her to handle all of Reva's psychological costs and those of Morgan not covered by Alan's insurance; all of her own psychotherapy; all family therapy— including that between Alan and Morgan not covered by Alan's insurance; all of her attorney's fees, half of Morgan's other uninsured medical expenses, and half of the guardian ad litem's fees. Alan was ordered to provide insurance coverage for Morgan

14

and Reva, and to pay $500 per month in child support to Antionette.

The court found that the special master, as instructed, had equitably divided the marital property. It further determined that each party pay its own attorney's fees, and that Antionette was employed full-time and had sufficient assets to pay her own attorney's fees. After a thorough review of the record, we hold that the District Court's division of liabilities and acceptance of the special master's division of marital property was not clearly erroneous. We further hold that the District Court's failure to specify the net worth of the parties, in light of the record before us, was not reversible error.

V

Did the District Court err by modifying custody pending appeal?

On August 12, 1993, Antionette appealed the District Court's decision. On August 26, 1993, the District Court ordered a temporary change in custody, a temporary restraining order against Antionette, and an order to show cause. The order, based on a motion by the guardian ad litem and supported by the affidavits of Alan and Dr. Baxter, was based on the following concerns: 1) that Antionette had not sought therapy--designed to safeguard Morgan's best interest--as required by the District Court; 2) that Antionette continued to challenge the decreed visitation plan, which successfully progressed from supervised to extended unsupervised visitation; 3) that Antionette continued to allege that Alan sexually abusing Morgan, and sought medical examinations

15

to prove such abuse; and 4) that Dr. Baxter, who has withdrawn from the case (based on the appeal and on Antionette's dissatisfaction with her performance) in favor of Dr. Cindy Miller, is concerned that Antionette "is continuing to stifle Morgan's normal emotional responses and desire for a relationship with her father."

The order placed Morgan in Alan's sole custody and limited Antionette to supervised visitation only. It required Antionette to undergo immediate psychological evaluation to determine

> whether Petitioner and her demonstrated course of conduct constitute a danger to Morgan's physical, mental and emotional health and . . . whether Petitioner is capable of obeying the specific orders of this Court and the conditions imposed upon her previously awarded residential custody.

The order required Antionette to transfer custody of Morgan to Alan; restrained Antionette from harassing, molesting or disturbing the peace of Morgan or Alan; temporarily waived Alan's child support obligation; and ordered Antionette to appear before the District Court on September 3, 1993, to show cause for her actions. Antionette did not appear before the court on September 3rd. According to Antionette's attorney, the reason she failed to appear is that she was "too terrified" of the District Court Judge to appear before him again. Antionette's attorney maintains that Antionette has remained in telephone contact with him, but refuses to disclose her location.

We note that Morgan is now living with Alan in Butte, and Antionette has not attempted to visit Morgan. On August 24, 1993, Antionette moved this Court for a writ of supervisory control, seeking a stay of the decreed visitation and substitution of the

16

judge. We denied her motion on September 16, 1993.

When, as here, a notice of appeal has been filed, the long-established rule in Montana is that jurisdiction passes from the district court and vests with this Court. Powers Mfg. Co. v. Leon Jacobs Ent. (1985), 216 Mont. 407, 411, 701 P.2d 1377, 1380 (citation omitted). Some exceptions exist, however. See, e.g., Churchill v. Holly Sugar Corp. (1981), 192 Mont. 533, 536, 629 P.2d 758, 760 (court retains jurisdiction over ancillary matters); Northern Plains Resource Council v. Board of Health and Environmental Sciences (1979), 184 Mont. 466, 472, 603 P.2d 684, 688 (court can correct clerical errors); State ex rel. Kaasa v. District Court (1978), 177 Mont. 547, 551, 582 P.2d 772, 775 (court can award necessary maintenance, child support and suit monies after judgment has been entered in a dissolution proceeding pending appeal).

The present case falls under no exception of which this Court is aware. The District Court, though arguably acting in the best interest of Morgan, lacked jurisdiction to generate any orders relating to those issues on appeal to this Court. Therefore, we vacate the District Court's temporary order of August 26, 1993.

Finally, we will address an issue not raised but discussed in the briefs, whether the court erred in failing to remove Alan's name from Reva's birth certificate. Testimony at trial indicated that Alan, during the initial hearing in April, 1992, testified that it was his belief that Antionette wanted him to adopt her daughter, Reva. In fact, Alan had hired an attorney to assist them

17

in the adoption proceedings. Alan was uncertain as to why they never followed through with the procedure, although Antionette obtained Reva's birth certificate on her own and it was amended to state that Alan was Reva's father.

We conclude that this matter is not properly before this Court on appeal and that an alternative procedure for a change of name, pursuant to §§ 27-31-101 et seq. MCA, is available to Antionette if she desires to have Reva's last name amended on her birth certificate.

Because of the sensitive nature of this case, the unusual events which have transpired, and the potential emotional harm to Morgan, we remand this case to the District Court for a hearing on the issue of custody. We reinvest with the District Court jurisdiction for the limited purpose of determining custody. A custody hearing will ensure the due process rights of Antionette and Alan, and provide them ample opportunity to present evidence and be heard with regard to custody. To promote stability and continuity in Morgan's life until a final custody determination is made, Alan shall retain sole custody of Morgan. We direct the District Court to expedite the hearing on this matter.

Affirmed in part and remanded for a custody hearing to be conducted consistent with this opinion.

John Conway Harrison
Justice

18

We concur:

_William E. Hunt_

_Tom Frieville_

_____

_Karla M. Gray_
Justices

19

April 21, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Christopher Daly
Attorney at Law
415 N. Higgins, Ste. 16
Missoula, MT 59802

Christine Somers
Haxby & Somers
P.O. Box 3008
Butte, MT 59702-3008

Kevin Callahan
Attorney at Law
218 E. Front
Missoula, MT 59802

Lori Maloney
Clerk of District Court
155 West Granite
Butte, MT 59701

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy